This 3-18-82 was created in Illinois ex rel. Illinois Department of Labor by Richard Hussick, Chris Lion Construction, Adelaide by Bruce Cook. Thank you. Mr. Hussick. Good morning. Good morning. May it please the Court, Counsel, I'm Assistant Attorney General Richard Hussick, Counsel for the Appellant to the people of the State of Illinois on the relationship of the Illinois Department of Labor, in this case involving not so much the meaning of the Prevailing Wage Act, but whether the Prevailing Wage Act by its terms is preempted as a matter of Federal law by the Employment, Retirement and Income Security Act, commonly referred to as ERISA. The basis for the Circuit Court's holding in this case was that this Federal statute, ERISA, which applies to private sector pension systems and health care systems and also, I learned in this case, also to employee training program plans that are governed by ERISA, whether that Federal statute preempts the fringe benefit aspects of the Illinois Prevailing Wage Act. And I urge the Court to reverse the Circuit Court because on the critical question of law presented in this case, the answer is that ERISA does not preempt the Prevailing Wage Act's fringe benefit provisions when an employer makes contributions to an ERISA plan, but one that is not an approved employee apprenticeship training program approved by the U.S. Department of Labor. And that's what the Prevailing Wage Act specifies, is that among the fringe benefits that an employer on a public works project has to pay, either for the benefit or cash to the employee as an alternative, are pensions, welfare benefits, typically health care, and approved by the U.S. Department of Labor apprenticeship training programs. And that all depends upon whether in the area where the work is being done, that is the prevailing compensation. And so each of those things is required by the Prevailing Wage Act if that's what the prevailing wages and compensation are in the area where the work is done. So the policy is that taxpayers pay extra. The taxpayers are paying extra money out of our pockets for public works projects than there would be if there were no Prevailing Wage Act. And people might disagree with the policy, but that's the policy chosen by the representatives voted into office by the taxpayers. And the idea is instead of these public sector jobs going to the lowest bidder, whoever would charge the least, there is a desire to have the assurance of good compensation for the employees that they believe corresponds to reliable supply of workers and quality construction. And so in this case, the audit by the Department of Labor showed, and it's attached to the amended complaint, that the employer in this case on six different public works projects, line construction, did pay base wages equal to what the Prevailing Wage Act required, but did not pay fringe benefits for pensions, for health care, or for an apprenticeship training program approved by the U.S. Department of Labor. What the complaint alleges, and that's taken as true for purposes of the 2619 motion that was filed and was the basis for the circuit court's decision in this case, what the complaint alleged was that the employer, instead of taking additional money out of its pocket and putting them into fringe benefit programs for pensions and health care and an apprenticeship training program approved by the U.S. Department of Labor, instead deducted money out of the employee's wages and transmitted those payroll deductions to a local union plan that was governed by ERISA, but was not approved by the U.S. Department of Labor, and was limited to supposed apprenticeship training. In fact, neither the union fund, Local 944, their fund, nor any other entity in this case was approved by the U.S. Department of Labor to run an apprenticeship training program for general construction laborers. So were any pension funds paid on behalf of these particular workers from any source? None at all. They have no pensions that the prevailing wage act said that they should get by virtue of their work on these projects. They had no health care benefits. Now, the defendant's argument to the circuit court, and they've alluded to it again here, is that it's hard for the employees and the people that are members of this union, who are traditionally African Americans, to find jobs. And the union helped them get these jobs with this employer. And without this, they might not have any work at all. And I think that's all well and good. That's a good thing. I mean, we know the history of road construction in Illinois. And many years ago, it was essentially impossible for African Americans to get those construction jobs because the union doors, you know, were closed and the employers wouldn't hire them. That's unfortunately the sad history of road construction in many states, including in Illinois. But that doesn't justify denying the employees themselves the benefits that the prevailing wage act requires. The state is giving the employer extra money because they're required to meet these prevailing wage act requirements of giving the employees a pension and giving them health care benefits. And a very small component is supposed to go into apprenticeship training programs to help bring new people into the trade so that they can get the training necessary to then become journeymen and make, you know, the wages and have the job stability that comes along with being a journeyman. Here, however, that's not what happened. They still get that training if the money comes from them or from the company, from the construction company. I guess they get the training, but the statute and there's been no challenge to its validity as a matter of Illinois law. There's no challenge that it's unconstitutional as a matter of Illinois law to require that the training program be approved by the U.S. Department of Labor. And that ties into the longstanding Fitzgerald Act, which has been around for decades and essentially tries to encourage bona fide, high-quality apprenticeship training programs to help people that might not otherwise get a trade and an occupation to get the training necessary to do so. So in this case, there's, I don't think, any genuine dispute that none of the entities that the defendant points to, neither the union fund nor the defendant itself nor this Pembroke entity whose CEO is the president of the employer, contractor in this case, and maybe he left that position and now the CEO is his son, it looks like. But none of them were approved by the U.S. Department of Labor for apprenticeship training programs for general construction laborers. And so the training they were getting was not U.S. Department of Labor approved. And the result is they're not in compliance with the prevailing waging, which requires that you get a, you know, you're entitled to a credit if you make payments to such a program for that component, which is like 50 cents per hour compared to the, you know, 30-plus dollars an hour wages, the $8 an hour for the pension, the, you know, $5 an hour for the welfare benefits. There's a very small increment that goes into these training programs. And this case is on the preemption issue, which is a critical issue in this case. It's the central issue in the case, and I think it's really the only issue. Right. And the trial judge in this case relied on McCue. Correct. Which was a 1992 case. Predating Travelers and Scholten's and Dillingham. Right? Yes. So the cases from, I mean, 97, 96, 95 were ignored for a 92 case. Yes. And, you know, it's hard to fault circuit court judges dealing with complex issues at times. I think this was not a close call. This was a pretty safe call that the U.S. Supreme Court had spoken to this issue and the Illinois Supreme Court had said in the Scholten's case. It's a whole new ballgame here. After the U.S. Supreme Court's Travelers decision in 1995, there's a whole new paradigm. There's a fundamental shift in the analysis. The McCue case said if there's an effect upon an ERISA plan, that's enough to trigger preemption. And the Travelers case completely rewrote the analysis. That's one way to describe it. I mean, there was a dissent in the Travelers case that said we should just reverse our prior precedent in Shaw that suggests that there's a broader preemption test here. But the court essentially redefined in the common law tradition what they had previously meant. And they established new criteria for analyzing ERISA preemption. And the Illinois Supreme Court. In a simplistic way, it seemed like the McCue case said X and Travelers said no, that should be read as Y. I think that's a fair characterization. It was a fundamental rewrite of the preemption analysis. The Travelers, Dillingham, and the Shultz case as well as Chicago, I mean, two of those were Supreme Court ones. Now that gets picked up. Most cases define what goes on now, is that right? They are controlling precedent. And after Travelers, every single federal court case that has addressed preemption of prevailing wage act has said, even before Dillingham, but certainly after Dillingham, they've all said there is no preemption of state prevailing wage acts as they're commonly written. Because they do not depend upon an ERISA plan. They do not control an ERISA plan. And they do not enforce ERISA as a statute. And that's true for the Illinois Prevailing Wage Act here. We don't require contributions to an ERISA plan. We don't depend upon people being or not being part of an ERISA plan to get, you know, into an approved apprenticeship program approved by the U.S. Department of Labor. We're not enforcing ERISA requirements. There's nothing about benefits or the operation of these plans. Shultz is an Illinois case interpreting all this. Right. It's not a prevailing wage act case. It had to do with, you know, lien issues in connection with that alleged to relate to an ERISA plan. But they basically said, wipe the slate clean, start over. If you're looking at preemption, you have to look at it in a completely new way as defined by travelers. And, you know, that was a year after travelers. Another year later, in the Dillingham case, the U.S. Supreme Court, which is the last word on federal law of ERISA preemption, in a case involving a prevailing wage act and apprenticeship requirements out of the state of California, said that there was no preemption for the very reasons that apply in this case. That's the Dillingham case. That's the Dillingham case. It is so close to being on point, it's hard to find any light between that case and this case. And, you know, we consider it to be governing, controlling, and essentially on point as close as you can get in this type of circumstance. Is there any case anywhere after the travelers in Dillingham that goes back to this McHugh analysis? There is not. There was one case post-travelers, but before Dillingham, I believe. In between. The Washington Supreme Court had issued a decision in, I think, WB Electric. And several years later, the Washington Supreme Court, en banc, repudiated that analysis and came back into line with every other case that has analyzed this issue under, with respect to prevailing wage act. And part of the thinking in travelers, and articulated again in the Dillingham case, is that ERISA was not intended generally to wipe out states' traditional police power function to regulate employment and wages generally, either in the private sector or in the public sector. And this issue, as you and Ken Plyer expressed, it's the issue of preemption that's critical. It's not a question about policy and what's a better policy than that. It's a preemption issue. And here you've got an Illinois law statute. And is it negated or not based on preemption doctrine? That's exactly right. So it comes down to travelers and Dillingham. Exactly right, Your Honor. And maybe I went on at too much length in my brief, citing and describing all the federal court cases that have addressed the same issue and reached the opposite conclusion from the circuit court here. But it's uniform across the map, including state court review decisions dealing with prevailing wage act issues. And the primary discussion by the trial court here was McHugh. Yes. We did note also the second district's decision that came down after the Dillingham case, the Nicholas case, that it involved a slightly different issue. But the court said we can't consider McHugh as precedential because it doesn't take account of the subsequent change in the analysis that was occasioned by the traveler's decision and progeny from that decision. So thank you. I'm really here to answer questions more than just read from my script, so please. I don't count on you. We like to pepper people with questions. If they're relevant to what the court is thinking about and they're issues that are of live concern, I could, you know, recite my brief or I could read from my script. But really my goal here is to try and help the court understand what the live issues are and come to a, you know, a careful conclusion about them. So I think... Let me ask you a question that's bumping around in my brain. You mentioned the employer is getting a contract that pays, is based on the prevailing wage amount. So there are actually, there are bid factors into it, more money for wages. However, what's happening here is the employer is not contributing the funds. It's placed on the back of the employee. Is that correct? And it's a competitive disadvantage to the other contractors that are satisfying the prevailing wage act. But when I think of it in terms of the employee... Absolutely. They're... They're getting shortchanged is a simple way of putting it. By classification, by... Am I to understand most of these are African American? Yes. And so that troubles me in that it's just a subtle way of discrimination. Is that... I don't know that I can call it discrimination, but it is sort of a scheme or a subterfuge that defeats the purpose of the prevailing wage act to the detriment of these employees who are supposed to benefit from it. The employer gets... Yes. Just sort of to wrap, the employer gets this much money, which is more than you'd get on a regular non-prevailing wage act project, for the job, which includes enough, should include enough, to compensate for pensions and health care benefits and a modest additional amount to go into apprenticeship training programs. And the employer pays the base wages. But then when it comes to taking money out of the employer's own pocket to pay for these extra benefits, it doesn't do that. It takes some of the wages that it gave to the employees, deducts those, and sends this over to this union plan, which isn't a U.S. Department of Labor-approved apprenticeship program at all, doesn't provide pension benefits, and doesn't provide any welfare benefits. And it bumps up the amount the union is getting for the apprenticeship program because they otherwise would have been getting a smaller contribution. They would have been getting less than a dollar an hour, and here they're getting like $20 an hour, none of which is going apparently for the benefit of these employees in the traditional sense required by the prevailing wage act. I understand the public policy. Thank you so much, Your Honor. Thank you. Mr. Cook, good morning. Good morning, and may it please the Court, thank you for the opportunity to address you, Counsel. Are you looking forward to being peppered with questions as well? I will invite the questions, certainly, Your Honor. I do have to confess, I do feel like a little bit like Sisyphus pushing the boulder up the hill in light of what the law is concerning preemption. And let's just address that up front, because that is obviously one of the issues that this Court is called upon to address in this case. It's not the only issue from our perspective. To use an analogy, that's the boulder. That is the boulder, yes. And as your questioning colloquy demonstrates, there obviously is a line in the sand, a demarcation between the evolution of preemption law as it relates to ERISA. And as Counsel correctly pointed out, that demarcation began with the Traveler's case and continued thereafter with Dillingham and in Illinois with Shelton's. However, let me just make this point. The trial court was confronted with the lone case in Illinois that dealt with ERISA preemption in the context of the Prevailing Wage Act. And that, as you, Justice Carter, pointed out, was the McHugh case. That was it. That was the only case in the context. And so what it had before them in terms of Illinois law was that case. Now, below, there was no discussion of Traveler's or Dillingham, at least no meaningful discussion of it. And so the trial court ruled based on what it had beforehand, both in terms of the citations to the record, which we relied upon, which was McHugh. And I believe it was the Nicholas case that Counsel below cited. The Nicholas case was easily dispatched because in the very words of the decision, they distinguished McHugh by saying, we limit our holding to the context of this particular case. We do not address McHugh. And so the trial court in this case. This is a legal question. Well, yes. And can we ignore Traveler's and Dillingham? Can we just say, well, that really wasn't fleshed out enough below, so therefore based on, so we can't say the trial judge ignored something given the arguments for the trial judge. But the fact is, the reality is, there's Dillingham. There was Traveler's that changed it. Well, yes. And forgive me, Judge, I was just trying to provide the court with some greater context regarding how the legal question got here. But you are right. And it would be a fool's errand on my part to suggest that Dillingham does not apply and that Traveler's does not apply. And so I will not do that. I will say, however, that those cases are distinguishable somewhat on their facts. And I think in particular Dillingham, the distinction, I think, in terms of an understanding of this case is critical. In Dillingham, you dealt with an employer who, contrary to what the Prevailing Wage Act in California required, paid apprenticeship wages to its employees as part of an apprenticeship program that was not Department of Labor-blessed. This case is different. The employees, Lyons employees in this case, were not paid an apprenticeship wage. Indeed, the whole notion of apprenticeship is irrelevant in this case because we are not here dealing with an apprenticeship program. We are dealing with a training program, a training benefit, to be precise. Was the Prevailing Wage Act complied with in this case? That is our second contention, Judge. And, yes, we contend that the Prevailing Wage Act was complied with in this case. If you strip all of the pretense aside, the employees in this case were paid in terms of wages more than what the Prevailing Wage Act required. Secondly, with respect to benefits, they were paid more than what the Prevailing Wage Act requires. They were paid out of Lyons funds, and this is one of the differences that we have with the appellant. They were paid out of Lyons funds for a training benefit, and they were paid at a wage rate for that benefit greater than what the Prevailing Wage Act required. In the Prevailing Wage Act, there are certain categories, right? Correct. So your argument, as I understand it, and maybe you can set this out, that in categories A, B, and C, there was a little bit more. But what about C and D? The appellant's contention is that the Prevailing Wage Act should be construed as requiring the payment of wages, which there's no dispute here. There was that, and you paid more than what the act required. And then secondly, the payment of friends' benefits at prevailing wage rates. Now, they go further in saying that not only must you pay in total what the Prevailing Wage Act requires, but for each component listed in the statute, you need also to pay for each of those categories. We contend that that is an interpretation of the act that, frankly, is not borne out by the act itself. The act nowhere requires that. The Department of Labor has no authority in terms of rules and regulations to interpret it in that way, though historically they have. Historically they have, and there are, you recognize that the act has different categories. Correct. You acknowledge that you paid in certain categories more. Right, with respect to wages and with respect to training. There was nothing... That's a good question, Judge. There was nothing paid for pension. There was nothing paid for health or welfare. All of it was paid for training. Now... So you want to look at everything as a whole, not look at these different categories. Correct, and that's consistent with... Historically, it's not what these... Historically, that is not what has been done under the Illinois Prevailing Wage Act, but certainly that is what is done under the federal Davis-Bacon Act. But in Illinois, that's never been done. Well, it hasn't been done, this is true. However, we contend that that interpretation is not consonant with what the act plainly says, right, and what the authority of the Department of Labor has to issue rules and regulations interpreting the Prevailing Wage Act. Now, I think one fact is critical here. Can you give some deference to the administrative... Well, sure. ...interpretation of applicable statutes in their realm? Sure. I think deference is appropriate so long as that deference is exercised in a way that is not arbitrary, and that makes sense. In this particular case, it does not. Let me point out a couple of things. First, Appellant has made the point that these employees were deprived of pension contributions, health and welfare contributions. What he left out was that the employees themselves elected to have all of their benefit package paid in the form of training for the historical reasons that you, Justice Wright, alluded to, which is that historically there has been endemic discrimination in the craft trade, particularly with respect to road construction. These employees, already at a disadvantage, had the opportunity to, in effect, accelerate their ability to become journeymen and accelerate their ability to acquire the necessary experience in these trades through the training benefit. That's what it was for. The notion that they were being cheated, the notion that somehow Lyon was taking advantage of them or that the union was taking advantage of them simply does not comport with what the record evidence is. In a simplistic way, the fact is, however, that based on the way that this Act has been interpreted in Illinois, there was compliance with the total set up as it's been interpreted in Illinois. Well, if we accept that the interpretation, construction of the Act by the Department of Labor has been proper, again, there's no regulation. There certainly is no case. If that long-standing procedure is proper, it was compliant with the misgivings. Well... I mean, yes or no? Is it a yes or no question? I will say their practice was not complied with. I will not concede that that is what the law is or should be. I understand, but I'm saying if you assume that that long-standing practice is the law in Illinois, that wasn't complied with. Right. It is not the law in Illinois. I understand your position. Let me understand. Sure. The evil mind sometimes can't wrap itself around these issues. What is wrong with paying the employee the full amount and having them pay the training program? To me, there's some strong-arm going on here. Who's going to say you can't take it directly out of my wages? Who's going to say that because they won't be employed? Well, certainly that is under the appellant's formulation of the law. That is an option. Ryan could have paid them cash for however they wanted to apply it. But following that to its logical conclusion, if you accept that, as I've represented to the Court, that the employees themselves elected to have their wages, their friends' benefit wages, paid in the form of contributions to this training benefit, then they very well could have taken their cash to do that, as you just noted. And so my point is that— It doesn't go home with them. It's taken out of their paycheck. That's what bothers me. Well, no, it's not taken out of their paycheck. Ryan pays. It comes out of Ryan's coffers. It does not come out of the employee's check. That was a misrepresentation. And, indeed, the record evidence that we've provided in support of our 619 motion, through the affidavits of Mr. Mosley, the affidavit of Mr. Bynum, and the affidavit of Mr. Harris, lay out precisely what the scheme is. Is your argument that each and every one of these individual employees, individually, picked this one option? Anybody opt out and say, I want a different one? Well, Judge, there's no— I mean, you're saying they all voluntarily decided this. So— How do they vote on that? I'll try and answer your question in this way, and I'm not trying to tap dance around it. What we have in the way of record evidence in this case is the union application and the election that the employees made to, A, have deducted from their wages, and this is where kind of the dispute arises, deducted from their wages, their union dues and their initiation fee. But there is a second authorization, which is that Lyon, the employer, paid to the union, in the form of educational construction and training benefit, all of their fringe benefit wages for that purpose. Is it possible legally under this act, the Prevailing Wage Act, to opt out? An employee says, well, I'm going to opt out of that, so I'll let the employer do X because I choose to opt out. Can you do that? Sure, and that's an interesting question. The Prevailing Wage Act is silent on whether that is a thing or not. I will say that the U.S. Constitution, since we're talking about that in some respects, certainly the contract clause prevents the state from impairing one's right to enter into a contract. That's a slippery kind of argument to make if you've got an act that requires certain things. Well, again- I'm done to say, well, we can have these employees work for the benefit of the employer. It's a big picture thing. Let me push back on that notion, Judge, because, first of all, this was not an employer plan. This was a union plan, and the employer, Lyon, in this instance, was obligated to contribute as the collective bargaining agreement prescribed. Well, again, simplistically, if the act was complied with, would Lyons have paid more money? If the act was complied with- So, again, our belief- If the Prevailing Wage Act was complied with, would that require more money from Lyons? Our position is that the Prevailing Wage Act was complied with in that the amount paid for wages exceeded what the prevailing wage was for the particular area. But you're lumping all the categories together. But if your categories are category A, B, C- If you itemize the categories- If you itemize the categories, they paid on A and B maybe more than- But on these other categories, they didn't. So would Lyons have paid more than was paid? Well, I'll answer it this way. The collective bargaining agreement required Lyon to make the payments that it did. If the act is construed consistent with what the appellant has urged and what your question presumes, then, yes, Lyon would have been required to contribute for pension. They would have been required to make contributions for health and welfare benefits in addition to training and in addition to apprenticeship programs. I guess- What did these employees receive? What were they paid for pensions and health benefits? Lyon made no payments for pension, health, or welfare benefits, such as vacation. They didn't. And the reason they didn't, as I said earlier- Because the employees said we don't want it. The employees directed Lyon to pay their total fringe benefit package in the form of the training benefit. And explicitly that direction came from what? I'm sorry? Explicitly how that direction from the employee- So it was- How did it show up in the record? Twofold. One, it is in the collective bargaining agreement between the disadvantaged- I forget the long name, but Lyon was a signatory member of that- signatory party to that contract. And then two, in the union application that each of those employees signed, there is a bolded language that- by which they agree. They sign off and they agree that, one, dues, standard union dues checkoff clause, that dues and initiation fees can be deducted, and the authorization that Lyon pay out of its own coffers for the entire fringe benefit package in the form of the training benefit. And is there any case that indicates that the employee can opt out of the certain provisions, if they're interpreted their way, of the prevailing wage act? I have seen- Opt out by some other contract? Sure. I have seen no such case. I believe this case is one of first impression in terms of the particular contours, you know, presented here. That's what I'm leading up to. If we were to adopt your approach to the total package that's going to lump everything together, A, B, C, and D, and that there is the collective bargaining agreement, we would be saying that under the Illinois prevailing wage act, an employee can do this, right? Can opt out. Is that what we would be saying? Well, no. Either directly or indirectly? No. I disagree with that. We would not be saying they would opt out because the prevailing wage act, in terms of the wage rate that is required, is still complied with. What would be different is the requirement that you contribute to each itemized benefit listed within the act. Opting out of that. Opting out of all the categories. Is this before us? I believe it is, Judge. We raised it. We raised the question of whether Lyon, putting aside issues of preemption, that Lyon complied with the act. This is before you on the 2619 motion. You obviously had de novo reviewed, and so you can affirm the trial court on any basis disclosed in the record. The trial court reached this question. The trial court did not reach this question, though we did raise it in our motion to dismiss. The trial court chose not to go further beyond what was written in his order, correct? We did raise it. Would you be satisfied with a remand for the trial court to reach that issue? I certainly would be satisfied with that, as opposed to a decision. Exactly. I understand. I want to understand both sides of the public policy argument. If we decide in favor of the state, will that discourage employment of disadvantaged workers that don't have the same opportunities, based on complexion? Well, I think that it would make it more difficult to the extent that this particular benefit scheme was designed. Don't use the word scheme. Plan. Plan. Thank you. Was established to essentially accelerate the learning curve. Now, the union is primarily African American. It's not exclusively African American, so anyone can join the union. But it's Genesis, if you will, that started with African Americans. Okay, so there will be no negative impact? I believe there would be, and I think, frankly, it's telling. Draw me a picture of what that would look like, please. Well, I'm certainly no sociological expert, but I will say that to the extent that you have built-in difficulties for new entries or recent entries into this particular market to acquire the skills to become a journeyman. And becoming a journeyman is the key. Once you become a journeyman, then you can pretty much work on any type of project. But in order to become a journeyman, there are certain skills that you have to acquire, certain on-the-job training that you have to acquire. That will not be available. Well, the ability of this union and the ability of this employer to provide that training and provide the benefits that the appellant is suggesting are required. Does the training program provide any pension, security, or health benefits to those participating in the program? Again, the plan is not ours. It's not mine. It is the union's. And they have made the decision that the benefit that they are going to provide for its members is this training benefit. And that's what the employees sign up for. Is the policy of the state of Illinois set forth in the Illinois Prevailing Wage Act, however it's interpreted, the policy of the state? There is, as I recall, and forgive me, I can't recall chapter and verse, but there is, as I recall, policy language within the Prevailing Wage Act that sets out that its purpose is, among other things, to discourage cheap labor coming in from other sources. But let me emphasize, we aren't talking about cheap labor. We pay them more. Lyon paid its employees more than what the Prevailing Wage Act. And if you look at the amount, the wage amount for the prevailing, for the, excuse me, the fringe benefits, they were paid more for that. Now, appellant, the Department of Labor, did not credit them for those payments. And that's part of what the fight on the record is. But in simplistic terms, we paid them more. So this is not an issue of cheap labor. From Lyon's standpoint. From Lyon's standpoint. Thank you. Rather, it is an issue of cheap labor from the employee's standpoint because what goes into their pocket is not prevailing wage. Well, it's telling. If I'm not correct, am I following that correctly? You say Lyon's paid. I can agree with that. Sure. But what does the employee receive? Is the employee receiving the prevailing wage? The employee, in terms of wages, yes, is receiving more than the prevailing wage. In terms of fringe benefits, our position is that they are receiving more than what the Prevailing Wage Act requires. They are not receiving that. They are not receiving contributions in all of the itemized categories reflected in the Prevailing Wage Act. That point we concede. But our interpretation of the Prevailing Wage Act is consistent with the Dave's Bacon Act, which appellant basically says supports their position. Well? If category A in my categories is wages, how is the way they determine what the wages would be? I'm sorry, Judge. How were the wages determined? Sure. The Department of Labor surveys the various localities in Illinois and bases its determination of what is prevailing in that particular locale based on that survey. In other words, that greater payment that you're arguing about, the wage payment. Is for that particular locale. So that is based on the determination made by the department about what that locale would justify, correct? Correct. It's reflected in... So when you're arguing that they're getting greater wages, that prevailing wage rate is established based on that locale, isn't it? Right. So let me... So when you compare it and say, oh, they're getting more here, that's based on what the entire state or the entire country... Right. It's more than what? Forgive my imprecision. The employees on the six public works projects that are the subject of this dispute, the employees received more in terms of prevailing cash wages than they would have had they simply been paid what the Prevailing Wage Act mandate. Define received for me. That's where I'm struggling. So there are two components. There's the cash component. So the dollars that they received, the take-home paycheck, if you will, the wage rate that they received was greater than what the Prevailing Wage Act required for these projects in these locales. The second component was the fringe benefit component, right? There are some that are zero because it goes directly to... Exactly. Does there come a point where there's a change in the fringe benefits, if you will, change from being all training component to them getting some kind of health care and pension benefit? Well, I don't know how to quite answer that, Judge, because, again, the plan is not that of Lion. It is that of Allied, the union. So theoretically, yes, the union established the plan. They administered the plan. Presumably they could change it however they want and however their members directed, but that's not something over which Lion has control. So if a person that you hire, and you're hiring, you're an Indiana company, but you're hiring Illinois workers for these six projects, is that correct? We are an Illinois company. That is incorrect in the record. Oh, okay. You're an Illinois company. Illinois company. You're hiring Illinois workers. Correct. So if somebody comes to you and you're hiring them and they've already exceeded journeyman status, does this still apply to them? You can... Let me put it this way. The training that is contemplated by the plan is vocational training. It is not apprenticeship training, right? So yes, as a journeyman, conceivably you could go for continuing education much as we as lawyers go through continuing legal education. Presumably you could do that. You are eligible to do that. Indeed, I believe the record reflects flagger training that a number of these employees avail themselves of. So it is possible, yes, even as a journeyman. Counselor, your time is up. Thank you. Thank you, Your Honor. Are there any other questions? Thank you, Mr. Cook. Mr. Huzak? May it please the Court. The traveler's case was brought to the circuit court's attention below by the defendant. And at page 11 of their reply brief, they referred to the traveler's criteria for analysis under ERISA preemption. They argued that Illinois' Prevailing Wage Act violated those criteria because they said the Prevailing Wage Act mandates employee benefit structures, binds employers or plan administrators to particular choices, and functions as a regulation of ERISA plan itself and constitutes an alternative enforcement mechanism for ERISA. There is no plausible basis to conclude that any of those things is true under the traveler's test and certainly in light of Dillingham. They brought the case to the circuit court's attention. They made those arguments. We submit that those arguments are not persuasive and that the controlling authority requires that the circuit court's preemption ruling be reversed just as a matter of ERISA preemption law. Opposing counsel did make a number of alternative arguments, which I think are somewhat of a strained effort to try and salvage a win below where the law and the facts do not support it. They have argued repeatedly that Lion used money out of its own coffers to pay these additional benefits to its employees that were entirely payments to the local 944 employee benefit plan. This was a section 2619 motion. Section 2619 motion admits the truth of the allegations in the complaint and the validity of the cause of action on its face and instead asserts additional affirmative matter to defeat the cause of action such as preemption. Here we allege that no money came out of the Lion's pockets. The attachment to the complaint that's specifically referred to in the complaint says that there were 33 percent of the gross wages that were deducted from the employee's paychecks that went to this union plan. And there is absolutely not a shred of affirmative evidence, much less sworn evidence, much less dispositive, uncontradicted sworn evidence in light of the various verified and sworn documents of the case. This shows that a single penny came out of Lion's coffers in addition to the base wages it paid to these employees. In fact, the evidence shows just the opposite, that it paid them the wages and took approximately a third back and sent it to the union fund. That is certainly not a basis to credit the assertions made in the briefing here and below of the theory. Contrary to the allegations of the complaint, the Lion's own money was used on top of the base wages to pay for any of this thing. The public policy issue is addressed at page 17 of our reply brief. As a matter of public policy, people do not have the right to contract out of the laws of the State of Illinois that establish public policy requirements. You can't contract out of a minimum wage requirement. You can't contract out of the 13th Amendment. There are lots of things you can't contract out of. This is one of them. The Prevailing Wage Act is one that you can't contract out of by agreeing with a union where you really have no real choice. It's a Hodgson's choice. You get the job. You sign up with the union. The union refers you to the employer. You sign the documents, and you get what you can take and what they give you. There's an argument. These contributions can be the subject of a contract between the employee and the training employee. Please restate that. I didn't get the beginning of the question. Even if we rule in your favor and agree as a matter of law that the trial court should be reversed, we're not establishing public policy that destroys the training program. We're only saying that if the employee wants to contribute an amount equal to what he would have put in his pension or he would have paid for insurance, the employee, once he receives those funds, can then, as a matter of contract, pay it to the union. Absolutely. If the employer received everything that they were entitled to on the act, they could go to the track or to the casino and blow it if they wanted that way. What I'm concerned with is establishing some sort of a public policy that nullifies the incentive to have these training programs. But we're just removing the compulsory requirement. Well, we're also saying, and I think this goes back to the core issue which is presented in this case, which is that this is not an employee apprenticeship training program approved by the U.S. Department of Labor. So, you know, they first went to say if we put any money of our own money or the employee's money, it kind of doesn't matter, into this local union fund, if it's not U.S. Department of Labor approved as an apprenticeship program, it doesn't matter. It wipes out all fringe benefit requirements, not just the, you know, 50 cents on the dollar, but the extra $15 that is supposed to go to pensions and welfare. And then they sort of backpedaled and said, well, no, it should be given credit, you know, at least for the apprenticeship training component. And our answer is it shouldn't even be given credit for that component because it's not a U.S. Department of Labor approved apprenticeship training program. I understand your answer. Thank you. And as to the supposed fallback argument that they're challenging the validity of the department's interpretation, that each of these categories has to be separately satisfied, I don't see, I don't remember anywhere in the record below where that was raised, and that's not a section 2619 argument. That's a 2615 argument or a summary judgment motion argument. If they want to argue that below on remand work at the motion to dismiss stage, if it's remanded, you know, all bets are off essentially except for the ERISA preemption argument. And if they actually show that they paid these benefits to the employees out of their own pocket, then they're in compliance with the Act and the case is over. I don't think that's what the evidence is going to show. Now, your opponent wants total affirmance, right? He would love total affirmance. I submit that that would not be warranted. But you're asking, you know, alternative, you're asking that the case, that this court find there's no preemption, and then it's remanded, that's what you want? Yes, because the dismissal was improper. The case should go back for proof as to the allegations in the complaint and any evidence that they want to submit that they actually complied with the prevailing way check. And issues then below, if it were remanded, would be the prevailing way check compliance. And any other affirmative defense that they want to bring besides ERISA preemption, they could put that in their answer as an affirmative defense. So it's wide open, but I don't think that this court, on the record before it, is in a position to affirm on any of the other grounds that have been asserted as a fallback and sort of a resourceful and somewhat desperate attempt to sustain the circuit court's judgment. Because the pleadings haven't been sufficiently developed at this point. And they're not proper under a 2619 motion, some of them. And it would not be good law to say that if a case comes up on a 2619 dismissal, then you can just sort of ignore the lanes that you're in as advocates below, arguing what's permissible for that type of motion and say, well, why don't we just treat it as a motion for summary judgment, where the respondent on the 2619 motion is thinking, all right, I'm dealing with affirmative matter that assumes the accuracy of my allegations and the validity of my legal theory as such and focuses only on its defense. So if there were any other arguments to be made below, they should be on a full record where everybody has notice and an opportunity to present the law and the facts relevant to those. I'd like to avoid giving the impression that I have no sense of indignation in this case. I think there is some by the Department of Labor and their advocates that this, I'll call it a subterfuge or a scheme, is improper. It undermines the policy of the Prevailing Wage Act. It is contrary to the interests of the employees whom the Prevailing Wage Act was intended to benefit. And the grounds for dismissing the complaint in this case are lack of merit as a matter of law and fact. I urge reversal and thank Your Honors for your time. Thank you. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible.